# CLARK & STEVENS *vs.* ELIZ. V. GERKE ET AL.

*Landlord and Tenant—Repairs—Rebuilding of Walls Condemned by Inspector of Buildings After Execution of Lease—Construction of Agreement and Lease—Payment for Wall Rebuilt by Tenant.*

When after the execution of a lease providing that the lessee shall make certain designated repairs, not connected with the walls of the structure, the Inspector of Buildings, acting under the authority of municipal ordinances, condemns the walls of the demised building as dangerous and orders their removal, the lessee is not required to rebuild the walls nor is he entitled to do so and charge the cost to the lessor. But if the subsequent dealings between the parties indicate that the lessor requested the lessee to rebuild the walls so that the terms of the lease may be complied with to the advantage of both parties, then he is liable for the cost thereof, although at the time he contended that under the lease this expense should be borne by the lessee.

A lease of a warehouse for a term of years provided that the lessees should make at their cost certain repairs and alterations according to an architect's specifications; also that the lessees would keep the premises in good order and surrender the same at the end of the term in as good condition as when received, natural wear and tear excepted, and that whatever alterations and repairs the lessees shall be permitted to put upon the premises shall be done at their own expense. The specifications made no reference to the side walls of the building. Subsequently and before the beginning of the term, the Inspector of Buildings of the City condemned these walls as unsafe and directed that they be made secure or removed. The lessees then filed a bill in equity to enforce the lease and asking that the lessors be required to pay the cost of rebuilding the defective walls. In this proceeding an agreement between the parties was filed setting forth that the lessees should enter the premises and might make such other repairs on the demised premises as they might think reasonable, over and above those mentioned in the lease, the premises to be restored at the end of the term in the same condition as contemplated by the specifications; also that the lessees should pay the rent monthly until an account should be passed by the Court determining the respective rights of the parties as to any claims to be allowed. The lessees then took down the condemned walls and rebuilt the same, and also made the improvements called for by the lease. These latter could not have been made without the rebuilding of the walls. The condemnation by the Inspector imposed on the lessors the obligation to remove walls but not to rebuild the same. *Held,* that since the law imposes no obligation upon

either landlord or tenant to make repairs in the absence of a covenant, there was no implied obligation upon either of the parties to rebuild the walls.

*Held*, further, that the provisions in the lease as to keeping the premises in good order and making the designated improvements did not require the lessees to reconstruct the defective walls.

*Held*, further, that the subsequent proceedings in the equity cause and the agreements therein indicated that the lessors required the lessees to do the rebuilding and amounted to an arrangement by which the lessees should do the work and leave it to be determined by the Court who should pay therefor, each party at the time claiming that the expense should be borne by the other; that the rebuilding was necessary to enable the lessors to obtain the rent reserved and necessary for the lessees in order to make the improvements and obtain the benefits of occupancy; that under these circumstances the lessees are in the position of having rebuilt the walls not as volunteers but at the request of the lessors, and that the lessors should pay the cost thereof.

*Held*, further, that the lessors are not liable for any expense connected with the removal and rebuilding of the defective walls beyond what was necessary for a compliance with the municipal building regulations, and consequently should not be charged with the cost of fire shutters which were not demanded by such regulations.

*Held*, further, that under the lessee's bill and the consent of the parties that their rights should be adjudicated in the cause, the Court has jurisdiction to decree the relief asked for by the lessees.

*Decided December 19th, 1906.*

Appeal from Circuit Court of Baltimore City (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Frederick W. Story*, for the appellants.
*Chas. W. Field*, for the appellants.

The tenants were powerless to take possession of the premises, or to put their architect, or their builder, in possession of them to make the former's repairs, or any repairs at all, until the order of the Building Inspector to rebuild these defective walls was complied with. At once the question arose between the landlords and the tenants as to whose duty it was to re-

build or repair these dangerous walls, the landlords or the tenants. Each claimed it to be the duty of the other; and that question is practically the main question at the root of this case. The tenants claim that under the law, that duty was specifically placed upon the landlords, as owners of the property. The landlords admitted this to be true, but claimed also, that under the lease between them and the tenants, that the tenants had *contracted* to be responsible for all possible repairs, including such repairs as these.

The question before this Court is practically which of these contentions was right?

The Building Inspector's order of condemnation was dated February twenty-eighth, 1904, the day before the lease was to commence. Meanwhile, one Wagner, tenant of the first floor of the premises, refused to vacate the premises, and actually held on to possession for the period of about seven weeks, or until April twentieth, 1904. During all this time, the tenants were kept out of possession of the property without their fault. On *March 17th, 1904*, the bill in this cause was filed, asking for a specific performance of the lease, that plaintiffs should be put in possession of the premises, and that defendants should be compelled to pay the cost of rebuilding these defective walls, and replacing these defective joists, under the orders of the Inspector.

It never could have been intended by either party to provide in the contract itself, for such repairs, because neither party ever dreamed that they would be required. The testimony shows *no knowledge* on the part of either landlord or tenant when the lease was signed that these walls were defective. Both apparently believed them sound. And therefore this contingency was one not intended to be provided for in the lease.

Under *Middlekauff* v. *Smith*, 1 Md. 340; *Hess* v. *Newcomer*, 7 Md. 325, and *Stultz* v. *Locke*, 47 Md. 562, the tenant is relieved from all responsibility from these defective walls. (1) Because he only contracted to keep them in as good condition as when received, and (2) Because he excused himself from re-

sponsibility for "natural wear and tear." And in the Hess case, it was held that this exception saved the tenant from just such a defective wall as existed in this case. It is true, that he contracts to surrender them "In as good condition as when received, subject to the changes stipulated in said written memorandum," referring to the architect's repairs. Of course, these repairs would make a vast improvement in the property, and the condition in which the tenant should surrender them would be therefore, much better than they were when he received them by virtue of these repairs. But he contracted to improve their condition *only in so far as those repairs alone would improve them*, and those repairs *had no connection with the walls of the building which were condemned.*

The next covenant provides, "That whatever alterations or repairs said tenants shall be permitted to make and put upon the said premises, shall be done at their own expense; and previous to quitting said premises, they will put them in the same condition as when received, subject to the changes stipulated in the said written memorandum." This last sentence about putting the premises in the same condition in which they received them, is a mere repetition of what had already been said. The additional sentence is the one reading: "that whatever alterations or repairs the tenants *should be permitted to make*, should be done at their own expense." Now what does this mean? Nothing but another way of saying that the tenants should keep the property in repair; and that if they get permission from the landlord to put other betterments on the property, they should pay for them themselves. In the original contract, the tenants were foibidden to make *any* alterations without the landlord's consent. And here it is provided that if they got such consent, they must pay for the alterations themselves.

The agreement of May 18th, 1904, was signed two months after the bill in this case had been filed, and almost two months after the answer had been filed, and one month after the tenants had obtained possession of the premises. Its bearing is most important. The issue was then made out, and the only

practical question before the Court or between the parties was, who should pay for these condemnation repairs. For the tenants had possession on May 18th, 1904, and had had it for a month, so that question was not open. Under these circumstances this agreement was executed and filed in this cause. It provides in effect, that, "the lessees may make such other and further changes and repairs as they may think reasonable and convenient, over and above those mentioned in the lease," "and notwithstanding any prohibition contained in said lease." It will be remembered that in the original agreement, of April 30th, 1903, the tenants were expressly forbidden to make any other alterations or changes whatever on the building, except the designated changes; and this prohibition was still in force. The obvious intention of this paper therefore, was to remove this prohibition and allow the tenants to make such changes as they saw fit. But it was nowhere provided that the *tenants were to pay for them;* on the contrary, it was expressly provided that the question as to who should pay for them, should be reserved for the future decision of this Court under an account passed in this cause.

If that paper had meant, or been intended to mean, that the lessees should pay for the condemnation repairs, why did it not say so? And why this clause about passing an account before the Court allowing set-offs or counter-claims against the rent in favor of the lessees and against the lessors? If the lessees agreed then and there to pay for those defective and condemned walls, that ended the case. There was nothing else left to decide or to contest. The testimony taken a year later (in March, 1905) was a useless waste of time.

The agreement of May 18th, 1904, was intended to secure the prompt remodeling of the building to render it safe and secure, and to hold the question open as to who should ultimately pay the bill, for the future decision of this Court.

We hold therefore, on the first point of this case, that neither by the original agreement of April 30th, 1903, nor by the lease of October 31st, 1903, nor by the concurrent agreement of same date, nor by the further agreement of May 18th, 1904,

nor by all of them put together, were the tenants ever bound or obligated to pay those condemnation repairs, namely, the expense of tearing down and rebuilding those defective walls and joists, condemned by the Building Inspector as such, before this lease took effect. Clearly therefore, it was not the duty of the tenants to pay for those repairs.

The law imposes no such duty on them, unless they expressly contract to do so. All the law requires the tenant to do is to use the property with reasonable care, and not to wilfully neglect or injure or deface it.

Under the municipal ordinance, as soon as property is condemned, the burden is thrown by law, upon the *the owners, not the tenants*, to repair the same, and the city is given a lien on the building for the cost of such repairs if the owner declines to make them. In this case the building was condemned, as the notice of condemnation served on the owners shows. They declined to repair it, and it then became the duty of the Building Inspector to do so. If he had done so he would have been authorized to sell the lot and building for the landlord's failure to repay him, and in that way not only the interest of the landlord, *but the leasehold interest of the tenants*, would have been wiped out of existence.

For their own protection, therefore, the tenants were compelled to do one of two things, either to wait and let the Building Inspector repair the walls and then pay him off, or to do the work themselves on behalf of the landlords. They pursued the latter course, and having done so, they are entitled in right and justice to claim reimbursement from the landlords, whose duty they performed, and whose debt they paid.

If it was the duty of the landlords, under the law to pay for these repairs, and not the duty of the tenants, then clearly it is the duty of the Court to so declare, by ratifying the Auditor's account stated herein, which is based on that principle. The only further defense to be considered, is one thrown out in a casual way in Mr. Surratt's brief, namely, that the tenants in paying this expense or assuming liability for it, acted as volunteers, and being such, cannot ask repayment from the

landlords, whose debt they assumed voluntarily and without request.   If the tenants were volunteers in acting as they did, this doctrine would be correct, but an examination of the law on the subject as laid down in all cases of subrogation, shows conclusively, that they were not volunteers, and that therefore having paid a debt or assumed one for which the landlords were in right and justice responsible, in order to protect their own interests, they are entitled to subrogation against the landlords, and their property.   The doctrine laid down in all the cases is that one who pays another's debts in order to protect his own property or his own interests, is not a volunteer or a meddler, but is simply taking lawful means to protect his own welfare and is entitled to the protection of the Courts and to be subrogated to the rights of the creditor, whose debt he paid; and this whether the party paying the debt could have been lawfully compelled to pay it or not. That question makes no difference at all.   *Sheldon on Subrogation,* secs. 13, 14; *Twombly* v. *Cassidy,* 82 N. Y. 157; *Spaulding* v. *Harvey,* 13 L. R. A. 619; *Arnold* v. *Green,* 116 N. Y. 571; 27 *Am. & E. Ency.,* 203, 235; *Harris on Subrogation,* 696; *Milholland* v. *Tiffany,* 64 Md. 455; *Mowell* v.*Hawkins,* 66 Md. 539; *Price* v. *Hobbs,* 47 Md. 383; *Billingslea* v. *Henry,* 20 Md. 282; *Williams* v. *Harlan,* 88 Md. 1.

These Maryland cases will show how broad is the Maryland doctrine of subrogation, and how it applies to every possible state of the case where one man for his own benefit or for his own protection, pays out money to pay off a debt or lien which in equity and justice ought primarily to be paid by another.

Under these authorities, it is clear that if the tenants had allowed the Building Inspector to repair these defective walls at the expense of the city of Baltimore, and then had stepped forward and paid off the city's claim to prevent a foreclosure of the city's lien on the building and premises, that they, the tenants, would unquestionably have been subrogated to the city's rights as against the owners of the property, the landlords, and the premises themselves.

The tenants made the repairs not because they wanted to, but because they had to, to protect their fourteen-year lease in the property from foreclosure and sale.

But we need not rely upon reason alone for this contention. The agreements of the parties themselves—filed in this case, settle this question and estop the landlords from claiming otherwise. In the first place, in their answer, they admit, as owners of the property, that they are responsible to the Inspector of Buildings in his official capacity, for the condition of their property. And by the agreement of May 18th, 1904, filed in this cause on May 27th, 1904, it was expressly agreed by them the tenants should make such further changes and repairs as they may think reasonable and convenient, and should pay the monthly rent, due under the lease, until an account shall be passed by the Court determining the respective rights of the parties, as to claims by way of set-off, damage or cross-claim of either party against the other."

Under these circumstances the landlords are estopped now to say that the tenants had no right under these circumstances to go ahead and do these absolutely essential repairs, leaving the decision as to who should ultimately pay for them to this Court.

Under this agreement of April 18th, it was clearly intended that Clark & Stevens should go ahead with the work, and keep an account of their claims against the landlords, and in case of disagreement, as to any item, that either party may apply to this Court in this cause to state a proper account thereof in due course. The main, if not the only dispute or question between the parties at that time, was the very question of the condemnation repairs. And under this agreement, that question was left open to the future decision of this Court.

Under these circumstances, can the landlords now claim that the tenants cannot call upon the Court for a decision of the question, as to who, under the law, and under the lease, are liable to pay for these condemnation repairs?

*Wm. H. Surratt,* for the appellees.

It is established beyond question that during the negotiations and at the time of the making of the lease, the plaintiffs not only had ample knowledge but ample means of knowledge of the conditions existing in this building and what expectation they might reasonably and justly form in respect to its fitness for the purpose to which it was to be applied. In view of this knowledge, and the means of knowledge which the plaintiffs had, it will be assumed that they leased the building subject to all consequences that these conditions might entail. *B. & O.* v. *Brydon,* 65 Md. 198.

The rule of *Caveat Emptor* applies to the tenants under this lease, and the landlords were under no obligation to remedy defects in the demised premises existing at the time of the demise. *A. & E. Enc.,* 2 ed., vol. 18, p. 216; *Lane* v. *Cox* (1897), 1 Q. B. 415; *Kaufman* v. *Clark,* 7 D. C. 1; *Booth* v. *Merrian,* 155 Mass. 521.

No active duty is imposed upon the landlords to disclose apparent defects which are equally within the knowledge of the tenant. *A. & E.,* 2 ed., vol. 18, p. 225: *Doyle* v. *Union Pacific,* 147 U. S. 413; *Davidson* v. *Fischer,* 11 Colo. 583.

And the rule of *Caveat Emptor* applies in such cases with full force. See as above, and *Gallagher* v. *Button,* 73 Conn. 175.

And it is said that in view of the fact that the rule of *Caveat Emptor* applies to leases under such circumstances that in the absence of agreement on the part of the landlords to repair, a tenant cannot recover from the landlord cost of repairs made by him. *Sheets* v. *Selden,* 7 Wall. (U. S.) 416.

And consequently there is no liability on the part of the landlord for debts incurred by the tenant in repairing. *Schrage* v. *Miller,* 44 Neb. 818; *Davis* v. *Benedict,* 49 Neb. 119; *Jones* v. *O'Farrell,* 1 Nev. 354.

It is a recognized principle that no active duty is imposed upon the landlord to disclose apparent defects which might be equally within the knowledge of the tenant. *Doyle* v. *Union Pacific,* 147 U. S. 413, and cases hereinbefore referred to.

Dealing, as the parties did, with a building known to be old,

it was a most natural expectation that weaknesses would be uncovered in the course of improvement, and in view of the extensive knowledge, actual or constructive, which the tenants had or could have had, ordinary prudence would have suggested a clause protecting them against this probable contingency.

The lessor is under no implied obligation to make repairs. *Whitcomb* v. *Mason*, 102 Md. 275; *Gluck* v. *Baltimore City*, 81 Md. 326.

The fact that by a fair construction of the lease in this cause with the agreement and Defendant's Exhibit Auditor No. 1, the tenants will be charged with that portion of the work which was in addition to that covered by the plans and specifications, cannot affect the final determination of this case. The Court will not permit considerations of great hardship to influence the rigid enforcement of established principles. *Abbott* v. *Gatch,* 13 Md. 314; *Dorsey* v. *Smith*, 7 H. & J. 364; *Barney* v. *Ins. Co.*, 5 H. & J. 144.

The Mayor and City Council of Baltimore and the Building Inspector were and are without any authority in the premises to order the rebuilding of these walls or any part thereof.

All the power which the Mayor and City Council had in the premises is a part of the police power, and that no individual can be subrogated to such power.

Clark & Stevens not having paid the builder and architects who did the work and rendered bills for these alterations, are not entitled to subrogation to such claims as these builders and others might have had against the defendants.

JONES, J., delivered the opinion of the Court.

The facts of this case are that the appellees are the owners of the lot of ground and premises in the city of Baltimore mentioned in the proceedings as No. 5 West Lexington street now occupied by the appellants for the purposes of their business, as merchants. On the 30th day of April, 1903, the appellees gave to the appellants an agreement to lease to the latter these premises for the period of ten years with the priv-

ilege of an extension of the term of said lease for a further period of four years at a rental of six thousand dollars per year, and on the 31st of October, 1903, accordingly executed a lease containing the stipulations and agreements provided for in the said agreement. Among the stipulations of the lease and agreement was one for the making by the appellants.(lessees) of certain repairs and alterations in the premises or the building thereon which were specifically provided for and definitely described in carefully prepared specifications accompanying the lease. These specifications make no provisions for repair of the side walls of the building, and make no reference at all to these walls in that connection other than to require some underpinning at designated places in the cellar. The term of the appellants (lessees) under the lease was to begin on the first of March, 1904, at which time they were to have possession of the leased premises.

In anticipation of their occupancy of the premises, the appellants sought from the proper authorities of the city of Baltimore, a permit, as required by the ordinances of the city, for doing the repairs and making the improvements required by the stipulations of the lease. The attention of these authorities being thus drawn to the premises in question and to the condition of the building thereon they pronounced the side walls unsafe and dangerous; and after making formal inspection of the same sent on February 29th, 1904, to the owners of the building and property (appellees here) a notice, through the Inspector of Buildings, to the effect that the walls in question had been "reported to be a menace to the safety of persons or property;" and that "the said building" was "therefore condemned, and in order to insure the safety of persons and property" the owners were "directed to have the same made safe and secure immediately, as required by sec. 94, Ordinance No. 82, approved July 25th, 1902, or to be removed as per instructions of the Inspector of Buildings * * * to avoid the possibility of danger."

On the 17th of March, 1904, the appellants filed in the Court below their bill of complaint against the appellees in

which, and in the exhibits therewith filed, appear the facts
which have been stated, and in which it is further alleged
that appellees (lessors) "did guarantee the general good con-
dition of the improvements on said premises at the time of
the making of said agreement and lease;" that the appellees
had not put them (lessees) in possession of the premises un-
der the agreement and lease but were putting "unreasonable
obstacles" in the way of the appellants "carrying out the spec-
ifications and stipulations" of the lease.   The bill then prayed
the Court to "take jurisdiction of all the matters aforesaid"
and to "specifically enforce and cause to be carried out the
contract contained in said agreement and lease and specifica-
tions;" that the appellants (lessees) be, by order of Court,
forthwith put in possession of the premises in question; and
that the appellees be enjoined from disturbing them (the ap-
pellants) in the possession of the same; that the appellants
might have the protection of the Court, in making the repairs
specified in the agreement, lease and specifications and that
the same be made under "the direction, control and protection
of the Court;" that "the repairs or changes, not contained in
said agreement, and lease and specifications, which may be
lawfully required by the Inspector of Buildings of Baltimore
City" might "also be made under the direction and protec-
tion" of the Court; "and the cost thereof   *   *   be charged
up in settlement against the lessors;" that the appellants might
"have the benefit and protection of the adjudication of the
Court" as to the settlement of the same, in set-off against the
rent stipulated to be paid under said agreement and lease, in
case the defendants will not or do not of their own accord,
indemnify the plaintiffs (appellants) under the direction" of the
Court; and that the appellants might have "other and further
relief." On the same day the bill was filed the Court passed
an order that a subpoena issue as prayed; that the appellants
be, forthwith, put into possession of the premises in question;
that an injunction issue enjoining the appellees (defendants be-
low) from disturbing the appellants (plaintiffs below) in such
possession "pending further orders or decrees" of the Court—

unless cause to the contrary should be shown before April 1st, 1904.

On the 28th of March the appellees filed an answer to the bill which admitted the lease, agreement and specifications; also the receipt, prior to March 1st, 1904, of the notice from the Inspector of Buildings of the city of Baltimore which has been herein referred to. . But the appellees deny that they had not put the appellant in possession of the leased premises under the lease; deny that they warranted the condition of the leased property; deny that they had put "unreasonable obstacles" in the way of the appellants "carrying out the specifications and stipulations" of the lease; and aver that the latter "were not only at liberty to make repairs and alterations, and otherwise comply with the specifications but by a covenant in the lease, were bound" to do so, and the appellees were desirous that the stipulation as to these should be carried out to place the property in a condition to produce revenue.

The answer then admits that the appellees, as owners of the property in question, were "responsible to the Inspector of Buildings in his official capacity for the condition of their property;" but denies "that under the terms of the lease they are compelled to establish such new conditions in their property as would allow the improvements and alterations to be made by" the appellants; and avers that on the contrary "by an agreement signed and sealed" by the appellants the latter agreed to save the appellees harmless which agreement is incorporated in the answer and is as follows: "Concurrent with lease of premises No. 5 W. Lexington street, of even date herewith and in consideration thereof, the undersigned lessees (appellants) therein named, as a condition precedent thereto, do hereby promise and agree that the lessors (appellees) therein named   *   *   *   are to be put to no cost, directly. or indirectly, for the changes in the building recited in the lease, or the making of said changes and the lessees hereby agree to use all diligence to cause said changes to be made as speedily as possible after the 1st day of March, 1904, under penalty of forfeiture of said lease and of all interest therein, or

the lessors may for want of such due diligence, cause the same to be done at the lessees' expense; all the rents and profits due and accruing before and up to the 1st day of March, 1904, to belong by right to the lessors.   Witness the hands and seals of Clark & Stevens, as lessees, this 31st day of October, 1903."

Subsequent to the answer there were other agreements between the parties filed in the cause which have a bearing on the questions to be determined.   On the 18th of April, 1904, an agreement was filed in which after some preliminary matter which does not affect such questions it was "agreed by all the parties" that the appellants should "forthwith make actual entry" on the premises "without the hindrance of any of the parties" to the cause and "without prejudice to the rights *   *   * of any of the parties" thereto; "and in case it should be necessary for the making of said entry "the appellants (lessees) were to have the right" to use the power and authority of any or all of the other parties."   It was then further agreed that the lessees on their part and the lessors on their part should "keep memoranda of their several claims under the exhibited agreement and lease and account with each other, and in case of a disagreement between them as to any account, or the rendering or settlement thereof, either party "might apply to the Court" in this cause to state a proper account thereof in due course."

On the same day there appears to have been passed by the Court the following order:  "Upon the above bill and exhibits, answer and agreement it is this 18th day of April, 1904, ordered by the Circuit Court for Baltimore City by consent that this Court take jurisdiction in this case and retain the bill for the purpose of carrying out said agreement; and that the plaintiffs (appellants) are hereby authorized and directed to take possession of the premises number 5 West Lexington street under the terms of said agreement."

On the 27th day of May, 1904, an agreement was filed in the cause to the effect that the lessees might "make such other and further changes and repairs in the demised premises

as they" might "think reasonable and convenient for their use and enjoyment of said premises over and above those mentioned in said lease—provided they should in the first place make all the repairs and changes stipulated in the lease and expend thereon the full amount specified therein—the lessees to give bond to be approved by the Court if necessary in an amount named "to secure the restoration of said premises at the end of the term of said lease, to the same condition as contemplated by the specifications (if the lessors shall then desire the said restoration); and that upon the execution of the agreement by the lessors the lessees would forthwith pay the rent stipulated monthly, according to the form of said lease, until an account should "be passed by the Court determining the respective rights of the parties as to any claim (if any) to be allowed by way of set-off or damage or cross-claims of the lessors against the lessees, or of the lessees against the lessors; as the case from time to time shall be, and in accordance with the former agreement as explained by this present agreement."

In connection with this last agreement it was further agreed that the lessees should advance the amount due from the lessors for taxes for 1903 and that such advance should be reimbursed to the lessees out of the rent in the mode indicated.

On the first day of February, 1905, the lessees filed in Court a petition in which they allege that they file with the same three accounts marked respectively "Building Account," "Tax Account" and "Rent Account," and ask that the papers in the case be referred to an auditor of the Court to state an account between the parties as to all of the matters involved in the proceedings in the case." The "Building Account" consisted of charges of contractors and architects for expenses incurred by the appellants in making repairs and alterations according to specifications accompanying the lease and in making further improvements under the authority of the subsequent agreement of the 27th of May, 1904; and also for like charges for expenses of tearing down, rebuilding and restoring the part of the building on the leased premises which

the Inspector of Buildings had condemned.   The Court ordered a reference of the proceedings to the auditor, who upon testimony taken before him stated two accounts on the theory contended for by the appellants (plaintiffs below).  In the one designated "Account Rebuilding" the appellants were allowed as against the appellees for expenses incurred in tearing down and rebuilding the condemned building.   In the other designated "Improvements" the appellants were charged with certain expenses for alterations and repairs incurred by them, under the contract for doing such contained in the lease, but not for those incurred for tearing down and restoring the condemned building.

The lessors (appellees) excepted to both of these accounts. To the "Account Rebuilding" because it charged them with the costs which have been indicated; and to the account "Improvements" because it did not charge to the lessees (appellants) such costs as well as the costs for alterations, repairs and improvements other than those for tearing down and rebuilding the part of the building on the leased premises that was condemned.   The Court sustained the exceptions and dismissed the bill.   The appeal is from this decree.   The evidence before the auditor showed that the appellants had made the contracts and incurred the expenses indicated in their "Building Account" filed with their petition of the first of February, 1905, and as to this there is no dispute.

The foregoing recitals from the pleadings and proceedings make it apparent that at the time of the decree below the only question the Court was called upon to decide was whether the obligation to assume the cost of, and payment for the removal and rebuilding of that portion of the building on the leased premises which was condemned and ordered removed by the Inspector of Buildings devolved upon the appellants or the appellees.

At the end of all of the proceedings in the case which preceded the final decree the appellees filed in the cause a petition in which is the allegation "that there is not now at issue any question between the plaintiffs and defendants in this

cause" and that the Court was without jurisdiction therein. It was accordingly prayed that the bill of complaint be dismissed. Looking to the allegations of the bill the Court undoubtedly acquired jurisdiction thereunder. The bill asked for the enforcement of the specific execution of the agreement that was the subject of controversy in the case alleging that the appellees were failing to carry it out. The question presented upon the statement of account between the parties by the auditor was made by the bill and under the peculiar circumstances of the case and in the then attitude of the parties before the Court was necessarily associated with the carrying out of the agreement.

The charter of the city of Baltimore (sec. 6) authorizes the city to provide for "the entry into and examination of all dwellings * * and buildings to ascertain their condition for health, cleanliness and safety; for the taking down and removal of buildings, walls, structures and superstructures that are or may become dangerous, or to require owners to remove them or put them into a safe and sound condition at their own expense;" and "to regulate the height, construction and inspection of all new buildings * *; and the alteration and repairs of any buildings already erected * * or to be erected." And in sec. 79 it provides that the Inspector of Buildings "shall have the supervision of the construction of all buildings erected in the said city, and shall see that the building laws relating to the construction of said buildings shall be complied with." By sec. 82 the duty is imposed upon the Inspector of Buildings "to enforce the execution of all existing or hereafter enacted building regulations and ordinances relating to the construction, alteration and removal of buildings, or other structures, walls, or parts of buildings or other structures."

It was in pursuance of ordinances enacted, and regulations prescribed, by virtue of the powers conferred in the foregoing provisions of the charter of the city of Baltimore that the inspection, condemation and order for removal of the structure upon the leased premises here in question were made, and its

rebuilding was regulated.   We do not understand that the existence or extent of these powers, or the propriety of the exercise of them in the circumstances appearing is called in question.   No more specific reference to the powers or to the regulations in pursuance of them, needs therefore to be made· The appellees admit, as we understand them, that as between themselves and the city authorities the obligation was imposed upon them to remove the part of their structure that was condemned as dangerous and ordered to be removed or made safe; and that when the same had been removed or taken down as ordered, if they elect to rebuild, they would have had to conform to the regulations prescribed by the said authorities in doing such rebuilding.

The evidence shows that the expenses incurred by the appellants in taking down and restoring the building in question were so incurred in doing the said removing and rebuilding in conformity with such regulations.   In claiming therefore to be reimbursed by the appellees for such expenses the appellants call upon the appellees to pay only what would have devolved upon them to pay if, in view of their contractual relations with the appellants and of the conditions under which the rebuilding was done, they had undertaken to remove and restore the condemned structure themselves.   In support of their exceptions to the account of the auditor which charges them with the expenses incurred in the  removal  and  rebuilding the condemned structure they insist that they are relieved of the obligation to pay such expenses by virtue of their contractual relations with the appellants—that the latter in carrying out their contract with them necessarily and legally incurred the obligation to do and pay for, the removal and rebuilding in question at their own (appellants) expense in order to secure to themselves the use of the premises for which they had ob ligated themselves to pay rent.

"The common law has always thrown the burden of repairs upon the tenant, though it imposes no obligation on him to make them unless he covenants to do so   *   *   *.   A covenant is never implied that a lessor will make them." *Gluck*

v. *Mayor & C. C. of Balt.*, 81 Md. 315–326, and authorities there cited. It is also laid down in previous adjudications of this Court that "although when a lease contains no express contract of warranty that the property is or shall be fit for the purpose for which it may be rented, there is no implied warranty to that effect, and in case the property falls down in consequence of some inherent defect, the lessor is not bound to repair, and yet the lessee will be compelled to pay the rent; nevertheless the lessee will not be bound to repair in such a case, if there be a covenant to repair and to return the property in the same condition he received it, natural wear and tear excepted; provided that at the time of the loss the lessee was using the property in a reasonable and suitable manner according to the object and design of the parties when the contract was made." *Hess* v. *Newcomer*, 7 Md. 325, 337.

Such being the law, there was here no implied obligation on the part of either the lessors or lessees arising out of their relations as such to do the rebuilding which is the subject of controversy. Their respective obligations in this regard must be sought in the express covenants they have made. · It is not pretended that the lessors (appellees) in this case were by the terms of their lease under express covenant to do the rebuilding which is here the subject of dispute, and the evidence in the case discloses no support of the allegation of appellants bill of a warranty by the lessors of "the general good condition of the improvements" on the leased premises. The inquiry now is, did the agreement or contract of the parties impose upon the lessees (appellants) the obligation to incur and pay the cost of removing the condemned structure and rebuilding the same?

The memorandum of agreement for a lease which preceded the formal lease after providing for the renting and the term and making reference to repairs thereinafter stipulated for contained the following provisions: "the repairs stipulated to be according to specifications and drawings of Mr. Cassell, now in the hands of the parties hereto (copy whereof to be annexed hereto, when signed); and to make the front of the house to

conform with the back when finished, if not so already included in above specifiations, said specifications to be modified accordingly; this will make basement, first and second floors, complete under one roof as agreed; no other changes of a permanent character to be made without consent of the owners or their authorized agent or attorney; the cost of all the changes hereinbefore stipulated not to exceed ten thousand dollars ($10,000) is to be paid by the said Clark & Stevens in consideration of the full term and privilege of renewal hereinabove specified; and the lessors are to be at no cost at all for said improvements." The specifications here referred to and which accompanied this agreement, and the lease thereafter executed, as part of the same, as has already been said, carefully described the work to be done in repairing without containing any reference at all to the defective walls; and the evidence shows that the repairs done according to these specifications cost a trifle over $10,000.

It appears therefore that the preliminary agreement between the parties and the specifications for which it provided contained no provision for repair of these defective walls. The lease refers to the memorandum of agreement as being thereunto annexed and recites that it is made in accordance with the stipulations contained in the memorandum and among other things provides that the lessees "will keep the premises in good order, and surrender the peaceable and quiet possession of the same at the expiration of the above term in as good condition as when received subject to the changes stipulated in said written memorandum, the natural wear and tear and decay of the property and unavoidable accidents excepted * * * and that whatever alterations or repairs said parties hereto of the second part shall be permitted to make and put upon said premises shall be done at their own expense; and previous to quitting said premises they will put them in the same condition in which they received them, subject to the changes stipulated in said written memorandum, unless otherwise and subsequently agreed upon by the parties hereto or their representatives, in writing; and that all improvements

·‑when made shall become the property of the lessors as fully and beneficially as if made by them at their own cost and expense."‑ There is then this further provision "that the standard of good order and good condition for the said premises, ‑under the terms of this lease, shall be the condition substantially of said premises when the same shall have been made to conform to the specifications and memorandum (hereunto an‑nexed); and the tenants shall keep the said premises, with all the rights and appurtenances thereto belonging, up to that ‑standard of good order and good condition (without this, the natural wear and tear and decay of the property and unavoidable accidents excepted)."

The foregoing provisions of the lease have been fully set out because they have been made conspicuous in the argument and briefs on both sides and are apparently regarded as having a significance to affect‑ the question which has been defined as the one here presented for decision.     It would seem to be obvious however that they can have no such effect. That question has reference to a present obligation.     The covenannts in the lease which have been set out and which impose on the lessees the obligation in respect to the condition of the property leased, which is therein expressed, relate to the condition thereof at the expiration of the lease.     The covenant will be gratified if the property be then surrendered to the lessors in the condition required by its terms.     Its effect is not to impose a present obligation to put the property in an improved condition or a changed or particular condition but to keep and surrender it in the condition in which the lessees received it subject to its natural deterioration from "wear and tear and decay."     This is the effect which the law gives to a covenant · of the character of that here under consideration. *Hess* v. *Newcomer,* 7 Md. *supra;* *Stultz* v. *Locke,* 47 Md. 562; *Middlekauff* v. *Smith,* 1 Md. 329. ‑ But more than this, the parties here by the express terms of their covenant, which were emphasized by repetition, gave to it the ‑effect which has been expressed and which ‑the law imputes to it.

Much significance has been attached by the appellees to the

agreement incorporated in their answer and which bears date on the same day as the lease. It is not perceived that this agreement has any force to support a contention that the appellants imposed upon themselves the obligation to incur and pay the expense for the removal and rebuilding of the structure which was condemned by the city authorities. This agreement created no obligation at all as respects the parties thereto as to costs named beyond such as existed by virtue of the lease. It left the parties just where the lease and the law placed them as to their contractual obligations in this regard. As respects the lessors it only negatived any obligation on their part to incur or be chargeable with the costs referred to. As respects the lessees it imposed no new affirmative obligation in regard to such costs. These the lessees had already contracted to bear and pay; and if such contract was carried out in good faith the lessors would be protected from becoming chargeable for costs for the changes in the building, recited in the lease, or the making of said changes; and these are the only costs to which the agreement makes any reference.

The result is that in the contract of lease here in question there is no provision which imposes upon the appellants (lessees) an obligation to repair or rebuild the defective walls or structure which the city authorities condemned as heretofore mentioned. It is made evident from the proofs in the cause, documentary and otherwise, that at the time of the lease the condition of the walls in question was unknown to both parties; and in the making of the contract of lease it was not in the contemplation of the parties thereto that the condition would transpire that made it necessary to remove and rebuild these walls in order to enable the lessees to effectuate their purpose in leasing the premises. When confronted with such condition upon the attempt of the lessees to enter upon their lease, and as preparatory thereto, to undertake the alterations and repairs they had contracted to do the question under consideration for the first time presented itself in the transaction between the parties. Upon the case as it then stood the appellees filed their bill in which among other things they

referred this question, which had provoked opposing contentions between the parties, to the Court.

Now under the notice from the city authorities, through the Building Inspector, to the lessors, which herein appears, in reference to removal of the building upon the leased premises or the making of the same safe, it is conceded that the obligation was imposed upon the lessors to comply therewith or be visited with the consequences of default. The lessors contend that under this notice they were obliged to remove the building but the city authorities could not require the rebuilding. Let that be conceded. Upon that assumption they had an election as to their action in the circumstances and they elected that the dangerous walls should be removed and safe walls built in their place. As to this they made no question. The only question made was whether the expense of such removal and rebuilding should be borne by themselves or the lessees. They also elected that the rebuilding should be done in such a way as to enable the lessees to carry out their contract for adding the repairs covered by the specifications which accompanied the lease. This appears from their answer to lessee's bill in which it appears, from reference thereto and recitals therefrom already made, they admit the agreement, lease and specifications as the appellants alleged these and deny that they prevented or sought to prevent the carrying out of the contract but on the contrary aver that the appellants "were not only at liberty to make repairs and alterations, and otherwise comply with the specifications;" but under their covenant "were bound so to do;" and further that "their desire has been to see the property placed in a condition where it would immediately produce revenue."

In addition to this, the answer after reciting the agreement incorporated therein which has already been set out averred "that by a fair and proper construction of this agreement the lessees are bound to make all changes and repairs in the building specified in the specifications, or otherwise; and are to conform to their covenant to deliver the premises in the same order as when received, the degree of order being defined by

lease." This answer was filed under conditions from which it appeared that the appellants could not carry out the contract for doing the repairs covenanted for in their lease nor enjoy the benefits of the lease without the rebuilding of the condemned part of the structure on the leased premises under the building regulations of the city of Baltimore. Notwithstanding this, the appellees held them to the performance of their part of the contract; indicated that they required the rebuilding to be done; but raised the issue upon the pleadings whether by a fair construction of the contract between them it did not devolve upon the appellants to do the same.

With the issue thus made in the case there was filed therein on the 18th day of April, 1904, the agreement already referred to in which, as has been seen, after agreement as to certain subject-matter of allegation in the bill, the lessees were authorized to "make actual entry" upon the leased premises and thus were put in position to proceed with the carrying out of the contract. And in which it was further agreed as follows that lessees and lessors should "keep memoranda of their several claims under the exhibited agreement and lease and account with each other; and in case of a disagreement between them as to any account, or the rendering or settlement thereof, either party may apply to this Court in this cause to state a proper account thereof." The same day the order of the Court which has been recited was passed in which the Court took jurisdiction in the case "by consent" for the purpose of carrying out the agreement and directed the lessees to take possession of the leased premises "under the terms of said agreement." Then followed the agreement filed in the proceedings on the 27th of May, 1904, in which after permission given to the lessees to make such other and further changes and repairs in the demised premises as they may think reasonable and convenient for their use and enjoyment "of the same;" and providing "that upon the execution of this agreement by the lessors the lessees will forthwith pay the rent stipulated for the month of April," it is agreed that the lessees shall "continue to pay the rent stipulated monthly according

to the form of the lease, until an account shall be' passed by the Court determining the respective rights of the parties as to any claims (if any) to be allowed by way of set-off or damage or cross-claims of the lessors against the lessees, or of the lessees against the lessors," &c., and that the lessees will advance the taxes for 1903 for the lessors.'

There is significance in this agreement in its provision for the payment of the rent regularly until an account could be had as therein provided because the plaintiff's bill had asked that the repairs lawfully required by the Inspector of Buildings might be made under the protection of the Court; that an account be stated "from time to time" between the parties and that they might have the benefit of set-off on account of said repairs against the rent agreed to be paid. The agreement for advance of taxes also showed a consideration for the arrangement that was provided. Upon the face of it, in connection with the considerations referred to, this agreement bears evidence of being an accommodation between the parties pending the question of whose was the legal liability for the repairs required by the proceedings of the Inspector of Buildings; and this is strengthened by the further consideration that that was the only matter open for an account between the parties at the time.

: From the state of case here presented it appears that the appellees (lessors) exacted of the appellants (lessees) the removal and rebuilding of the condemned part of the leased premises upon the claim that the obligation to do this resulted from the contractual relations between them; that the appellants were compelled to do such rebuilding in order to avoid delay and complication in securing the benefit of their contract with the appellees; that they however did the same protesting against their liability therefor, and in seeking the relief prayed for by their bill in this case, among other things, they referred the question raised by the appellees, in the regard mentioned, to the Court, and invoked its jurisdiction to determine the same; that the Court, by its express order, on consent of parties, retained jurisdiction over such question; and that in this

the appellees acquiesced as shown by the agreements of the 19th of April and 27th of May, 1904, and upon the considerations appearing in those agreements.

We have seen that there was no obligation implied by law or created by contract requiring the appellants to do the repairs and rebuilding here in dispute and it has been argued that in doing the same they were in the position of volunteers and so disentitled to recover the claim they here make on that ground. Under the circumstances here appearing in would seem to be clear that the appellants are not in the position of volunteers. They are rather in the position, in effect, of having incurred the expenses in dispute at the request of the appellees and the liability of the parties ought to be determined accordingly.

The allowance by the auditor of the expenses incurred by the appellants as against the appellees in doing the removal and rebuilding in question, including employment of contractors and architects, made necessary and proper in the case, in complying with the municipal building regulations, was proper; but beyond this the allowance ought not to go. Things done at the discretion of the appellants, if done without previous consultation with the appellees or their agent, or their subsequent ratification, are not proper to be allowed. For that reason the allowance for fire shutters in the auditor's account in question seems not to be a proper allowance as the testimony shows that these were not required by the building regulations; but, as expressed in the testimony were supplied as "a matter of insurance."

The decree of the Court below will be reversed and the cuuse be remanded to be proceeded with in accordance with the views of this Court.

> *Decree reversed with costs to the appellants and cause remanded for proceedings in conformity with the opinion of this Court.*